**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

NEDA SAMIMI-GOMEZ, individually and as personal representative of the Estate of
Kamyar Samimi;

NEGEEN SAMIMI; and

ANTHONY SAMIMI,

          Plaintiffs,

v.

THE GEO GROUP, INC.; and

JEFFREY ELAM PETERSON, M.D.,

          Defendants.

---

## COMPLAINT

---

    Plaintiffs, Negeen Samimi, Anthony Samimi, and Neda Samimi-Gomez, individually and

as personal representative of the Estate of Kamyar Samimi, by and through their attorneys Baker

& Hostetler LLP, and Mark Silverstein, Sara Neel, and Arielle Herzberg of the ACLU Foundation

of Colorado, for their Complaint against the Defendants, allege as follows:

### <u>INTRODUCTION</u>

    1.    After living in the United States for over four decades, on November 17, 2017

Kamyar Samimi was arrested by U.S. Immigration and Customs Enforcement (ICE) and taken to

the Aurora Contract Detention Facility (ACDF), operated by the GEO Group, Inc. (GEO).  He

died there fifteen days later.

2.      Mr. Samimi's death was the result of GEO medical staff's extreme mistreatment. GEO staff were clueless in treating Mr. Samimi's opioid use disorder ("OUD"). He had been taking methadone daily for more than 25 years. Dr. Peterson, the only full-time physician at the facility, cut Mr. Samimi off his methadone cold turkey. That action was medically unjustifiable. Then, Dr. Peterson failed to treat and respond properly to Mr. Samimi's severe withdrawal symptoms.

3.      Dr. Peterson prescribed various medications for Mr. Samimi's withdrawal symptoms. GEO nurses even failed to administer many of the prescribed medications. They also failed to properly monitor Mr. Samimi's withdrawal and failed to call an ambulance as his condition became critical. The nurses had never received any training on opioid withdrawal.

4.      Mr. Samimi's treatment was indicative of the general state of affairs with respect to medical treatment at ACDF. GEO had vacancies in key medical personnel for over six months. Officers complained to their lieutenant on a nightly basis about the nurses' failure to respond to detainees' medical needs.

5.      For his part, Dr. Peterson was always hard to reach by phone, although he was supposed to be on call 24/7. The morning of Mr. Samimi's death, he failed to return two calls and instead was hanging Christmas lights.

6.      Plaintiffs assert claims against Defendants for negligence, medical malpractice, wrongful death, and violations of the Rehabilitation Act.

## JURISDICTION AND VENUE

7.      This action arises under the laws of the United States, including the Rehabilitation Act, 29 U.S.C. § 794. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, and over pendent state law claims pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b).  A substantial part of the events or omissions giving rise to the claims occurred in the District of Colorado.

## PARTIES

9.      The decedent, Kamyar Samimi, was a resident of the state of Colorado.

10.     Plaintiff Neda Samimi-Gomez is the daughter of Kamyar Samimi.  She is a resident of the state of Colorado.  She is also the duly appointed personal representative of Mr. Samimi's estate, which has been probated in the Probate Division of the District Court for Adams County, Colorado, under case number 2019PR030694.

11.     Negeen Samimi is the daughter of Kamyar Samimi.  She is a resident of the state of Colorado.

12.     Anthony Samimi is the son of Kamyar Samimi.  He is a resident of the state of Wisconsin.

13.     Defendant GEO Group, Inc. is a Florida corporation with its principal street address located at 4955 Technology Way, Boca Raton, FL 33431.  Its registered agent in Colorado is located at 155 E. Boardwalk #490, Fort Collins, CO 80525.  At the time of the events and omissions giving rise to this lawsuit, this corporation contracted with ICE to, among other things, house detainees and operate and provide medical services to detainees at ACDF, where Kamyar Samimi was held from November 17, 2017 to December 2, 2017, and supervised and implemented such services.  Defendant GEO Group, Inc. employed the nurses who were responsible for the care of Mr. Samimi during his detention at ACDF.  Defendant GEO Group, Inc. is responsible for the oversight, supervision, and training of the staff at ACDF, including the nursing staff who cared for Mr. Samimi.  Defendant GEO Group, Inc. contracted with Correct Care Solutions, L.L.C. to provide a medical director at ACDF.

14.     At all times relevant to the subject matter of this lawsuit, Defendant Jeffrey Peterson, MD, was a resident of the state of Colorado.  Dr. Peterson served as the Medical Director of the ACDF facility and as the only full-time physician at the facility.  He was employed by Correct Care Solutions, LLC.

## CERTIFICATE OF REVIEW

15.     Pursuant to C.R.S. § 13-20-602(3)(a), counsel certifies as follows:

(a)     Counsel has consulted with medical professionals with expertise in the areas of the alleged negligence described in Plaintiff's Complaint and Jury Demand;

(b)     The medical professionals who have been consulted have reviewed all known facts relevant to the allegations of negligent conduct as complained of in Plaintiffs' Complaint and Jury Demand;

(c)     Based on review of such facts, the medical professionals have concluded that the filing of the claims against Defendant Peterson does not lack substantial justification within the meaning of C.R.S. § 13-17-102(4); they have also concluded that the filing of claims against GEO Group for the alleged negligence of nurses in its employ does not lack substantial justification within the meaning of C.R.S. § 13-17-102(4); and

(d)     The medical professionals who have reviewed all known facts relevant to the allegations of negligent conduct as contained in Plaintiff's Complaint and Jury Demand meet the requirements set forth in C.R.S. § 13-64-101.

## FACTUAL ALLEGATIONS

### Kamyar Samimi's Background and Arrest

16.     Kamyar Samimi was born in Iran in 1953, entered the United States as a student in 1976, and became a Legal Permanent Resident in 1979.

17.     Mr. Samimi had three children: Anthony, Neda, and Negeen.  They are currently 38, 26, and 22 years old, respectively.

18.     On November 17, 2017, agents from ICE arrested Mr. Samimi at his home in Thornton, Colorado.  The immigration arrest was based on Mr. Samimi's conviction for possession of a small amount of a controlled substance twelve years earlier. The immigration charge asserted that Mr. Samimi's twelve-year-old conviction rendered him removeable from the country. Mr. Samimi was taken into custody at ACDF.

19.     Mr. Samimi had been taking methadone daily for over 25 years to treat opioid use disorder ("OUD").

Overview of GEO's Mistreatment of Mr. Samimi at ACDF

20.     Beginning on November 17, 2017, and, over the next two weeks, Mr. Samimi endured numerous acts of neglect, callous indifference, and medical negligence.

21.     The U.S. Department of Homeland Security's Office of Professional Responsibility, External Reviews and Analysis Unit conducted a Detainee Death Review following Mr. Samimi's death.  Its investigation was conducted with the help of an outside agency called Creative Corrections.  Investigators reviewed records and video and interviewed GEO staff at ACDF.

22.     The findings in the report included noncompliance in 12 areas from the ICE Performance-Based National Detention Standards (PBNDS).  For example:

(a)     GEO had vacancies in key medical personnel positions at ACDF, including a director of nursing and a midlevel medical provider, for longer than six months;

(b)     GEO failed to complete an initial physical assessment of Mr. Samimi, in part due to the absence of a midlevel provider;

(c)     GEO was supposed to have an on-call physician available 24 hours per day, but Dr. Peterson, the facility's only full-time physician, was difficult to reach outside of working hours, including on the day of Mr. Samimi's death, when he failed to answer or return two phone calls;

(d)     The intake nurse's documentation of Mr. Samimi's possible early opioid withdrawal, a serious medical condition, did not result in an initial provider assessment within two days of intake, as required by GEO policy;

(e)     While Dr. Peterson wrote prescriptions for medications to treat withdrawal to be administered up to three times daily, as needed, and despite complaints of the symptoms for which medication was prescribed, GEO nurses administered only five of 42 doses for anxiety, 21 of 42 doses for restlessness/sleeplessness, 17 of 42 doses for pain, and four of 42 for nausea and vomiting;

(f)     GEO nurses failed to document administration of Mr. Samimi's medication on numerous occasions;

(g)     GEO nurses failed to conduct welfare checks every eight hours while Mr. Samimi was on suicide watch; and

(h)     GEO medical staff failed to transfer Mr. Samimi to an emergency room even though he exhibited life-threatening withdrawal symptoms, beginning in the week following his intake.

23.     In addition, the Detainee Death Review identified violations of GEO's own policies, including that its nurses failed to consistently perform nursing assessments each shift, did not take Mr. Samimi's vital signs every eight hours, as ordered by Dr. Peterson, and failed to call Dr. Peterson on different occasions despite observation of serious clinical symptoms.

24.     The report also noted several concerns regarding nursing care, including that GEO nurses did not take Mr. Samimi's weight after his initial intake, did not encourage him to shower, even though he refused to do so throughout his detention; and did not consistently document encounter times, pain levels, the justification for giving as-needed medications, accurate verbal/telephone orders, and completion of assessments for dehydration.

<u>GEO's Mistreatment of Mr. Samimi's Opioid Use Disorder and Withdrawal</u>

25.     In addition, the report took issue with GEO medical staff's lack of training in opiate withdrawal monitoring and treatment.

26.     GEO's medical staff did not comply with National Commission on Correctional Health Care (NCCHC) standards, which state that "severe withdrawal symptoms must never be managed outside of a hospital."  The NCCHC standards also warn that, "[d]eaths from acute intoxication or severe withdrawal have occurred in correctional institutions."

27.     GEO nurses at ACDF all reported that they were not trained in opioid withdrawal.

28.     This was even though ACDF received a high number of detainees with OUD.

29.     Indeed, GEO nurses apparently received no training whatsoever.  Their training was "on the job."

30.     In monitoring Mr. Samimi, GEO nurses used the Clinical Institute Withdrawal Instrument (CIWA), which is for *alcohol* withdrawal monitoring, instead of an instrument specific to *opiate* withdrawal, such as the most widely recognized and used Clinical Opiate Withdrawal Scale (COWS).

31.     CIWA is not compatible with opiate withdrawal instruments, as there are clinical differences between the two forms.

32.     And GEO nurses only completed the CIWA form four times—often incorrectly.

33.     The report stated:

Through their actions, [GEO] nurses demonstrated a lack of understanding of opioid withdrawal symptoms, including that drug seeking is to be expected.  They also demonstrated *inability to properly monitor a patient withdrawing from opioids and to recognize related life-threatening symptoms*.  Given the nation's current opioid epidemic, staff preparedness is fundamental to assuring patients are provided with appropriate care.  (Emphasis added).

34.     Dr. Peterson and GEO nurses repeatedly discounted Mr. Samimi's serious symptoms, which they attributed to him being a manipulative drug seeker who was "faking" his condition.

35.     Mr. Samimi did not receive methadone or an appropriate substitute.  He was cut off cold turkey, with devastating consequences.

36.     Dr. Peterson said Mr. Samimi's two fainting spells were not legitimate and that Mr. Samimi was not actually suicidal.  He said, "[m]ost of these people are manipulative," and stated that Mr. Samimi was just putting on an act to get methadone.

37.     During Mr. Samimi's detention, GEO nurses said things like, "[h]e was an addict," and "[i]f you're going to live like that it's expected you're going to die like that."

<u>Medication-Assisted Treatment</u>

38.     Following GEO policy, Dr. Peterson issued the order to that Mr. Samimi would not receive methadone or any appropriate substitute.

39.     Dr. Peterson stated in an interview that this order was based on GEO policy.

40.     Mr. Samimi suffered from Opioid Use Disorder (OUD), a chronic, relapsing brain disease that affects approximately 2.5 million Americans.

41.     Methadone is one of three FDA-approved medications for treatment of OUD and has been deemed an "essential medicine" by the World Health Organization.  There is no scientific evidence of successful treatment of OUD without medication.

42.     The sudden cessation of methadone violates the applicable professional medical standard of care, and causes excruciating withdrawal symptoms that include severe dysphoria, cravings for opiates, irritability, sweating, nausea, tremors, vomiting, insomnia, and muscle pain. It also leads to seizures in some cases.  These symptoms can sometimes lead to life-threatening complications.   Psychological symptoms of withdrawal may include decompensation, severe depression, and suicidality.

43.     The NCCHC has adopted a position statement calling for the "continuation of prescribed medications for substance use disorders," such as methadone.   Moreover, according to the Substance Abuse and Mental Health Services Administration (SAMHSA), "just as it is inadvisable to deny people with diabetes the medication they need to help manage their illness, it is also *not sound medical practice* to deny people with OUD access to FDA-approved medications for their illness." (Emphasis added).

November 17, 2017: Mr. Samimi's Intake Reveals He Has Been Taking Methadone for 25 Years

44.     Upon Mr. Samimi's arrival at ACDF the night of November 17, 2017, a GEO nurse provided an initial medical screening.

45.     Mr. Samimi reported to the nurse that he had been taking 190 mg of methadone daily. He said he was experiencing withdrawal symptoms, that he needed the methadone, and that he was worried about his withdrawal and back pain.

46.     The intake nurse did not include any information or details about Mr. Samimi's reported symptoms of withdrawal, even though the screening form called for such information.

47.     The nurse reported the methadone use to Dr. Peterson.

48.     Dr. Peterson said the methadone dosage could not be that high.  Dr. Peterson incorrectly believed that 190 mg was a lethal dose of methadone for Mr. Samimi. Nevertheless,

Mr. Samimi's self-report was, in fact, correct.  He was regularly receiving 190 mg of methadone from the University of Colorado's ARTS Parkside Clinic in Denver, Colorado (the "ARTS clinic").

49.     Dr. Peterson ordered that Mr. Samimi be cut off from methadone, and he did not prescribe any substitute.

50.     Instead, Dr. Peterson ordered lab studies; prescribed a series of medications intended to ameliorate some of the symptoms of Mr. Samimi's withdrawal; and ordered that Mr. Samimi's vital signs be taken every eight hours until further notice.

51.     The drugs that Dr. Peterson prescribed were: Ativan for anxiety, Clonidine as a sedative, Cyclobenzaprine as a muscle relaxant, and Phenergan for nausea.  He also ordered that ibuprofen be administered to Mr. Samimi regularly.  His prescription called for: Ativan 1 mg intramuscularly up to three times daily as needed for 15 days; Clonidine 0.1 mg orally up to three times daily as needed for 15 days; Cyclobenzaprine 10 mg orally up to three times daily as needed for 15 days; Ibuprofen 800 mg orally up to three times daily as needed for 15 days, and Phenergan 25 mg orally up to three times daily as needed for 15 days.

52.     Mr. Samimi vomited his first night at GEO's facility.  He told a GEO nurse, "I feel terrible," and he reported a pain level of eight out of ten.  The nurse's assessment noted tremors to Mr. Samimi's hands and an unsteady gait.

### November 18-23, 2017: Mr. Samimi's Withdrawal Worsens

53.     On November 18, 2017, Mr. Samimi complained to GEO nurses of withdrawal symptoms, including nausea, a headache, and back pain.  He let the nurses know that he had taken methadone for over 20 years.

54.     GEO medical records from November 19, 2017 indicate that Mr. Samimi was experiencing significant pain.

55.     That day, Mr. Samimi spoke to a friend on the phone.  He told the friend that he was "dying here" and "sicker than hell."

56.     During the morning of November 20, 2017, a GEO nurse completed the CIWA form for alcohol withdrawal.  On it she noted that Mr. Samimi was suffering from nausea/vomiting, tremors, paroxysmal sweating, and anxiety.

57.     That afternoon, a psychologist conducted a mental health evaluation.  Mr. Samimi told the psychologist that he started using opium recreationally at age 14 in Iran.  He said that in 1991, he followed the recommendation of a mental health professional in the United States to begin taking methadone as a medication, and that he had been taking methadone daily since that time.

58.     The psychologist noted that Mr. Samimi was in active withdrawal.  He complained of chills, nausea, stomach pain, headache, and body aches.  Mr. Samimi said he could not sleep and was exhausted.

59.     The psychologist, who was a certified Addiction Specialist III, identified Mr. Samimi as a patient in opioid withdrawal.  She did not think Mr. Samimi was being "dodgy" or "manipulative."

60.     A GEO nurse's progress note from the next evening, November 21, 2017, indicated that Mr. Samimi appeared anxious and was experiencing tremors.

61.     The following evening, November 22, 2017, a GEO nurse indicated in a progress note that Mr. Samimi complained of nausea, vomiting, generalized pain, tremors, and shivering related to withdrawal.

62.     The next day, November 23, 2017, GEO nurses documented that Mr. Samimi was experiencing tremors, pain, and weakness.

<u>November 24, 2017: Mr. Samimi Repeatedly Passes Out</u>

63.     Mr. Samimi's condition took a dramatic turn for the worse on November 24, 2017.

64.     That day, Mr. Samimi refused all three meals and said he had been unable to eat for the past three days.  He said he had been flushing food down the toilet because he could not stand the smell, likely due to the nausea that resulted from the opioid withdrawal.

65.     A log entry noted that at 6:32 a.m., Mr. Samimi was screaming out for a nurse and was stating that he has abdominal pain, and that nurses were notified.

66.     The entry at 7:45 a.m. states, "Detainee Samimi keeps on screaming."

67.     Despite Mr. Samimi's pleas, the next entry in the log was not made until 11:15 a.m. The entry noted that a nurse was in the cell with Mr. Samimi and administered medicine.

68.     At 1:50 p.m., Mr. Samimi approached the door of his cell to tell an officer he was experiencing abdominal pain.  Mr. Samimi fainted and fell to the ground.

69.     Two GEO nurses then entered the cell, and found Mr. Samimi on his back, lying on the floor, unresponsive.  Their attempts to rouse him verbally and physically were unsuccessful.

70.     Mr. Samimi regained consciousness following a sternal rub, after which the nurses lifted Mr. Samimi to a seated position.  He told them he had not eaten in four days.  Mr. Samimi passed out again.

71.     Mr. Samimi regained consciousness again following another sternal rub, and the two nurses moved a limp Mr. Samimi to the bed.  He complained of nausea, vomiting, and inability to eat.

72.     Mr. Samimi was experiencing an abnormally elevated pulse and abnormally low oxygen saturation.

73.     GEO's nursing assessment was dehydration and "possible drug-seeking behavior." The nurses' only action was to educate Mr. Samimi on diet, medications, and the importance of good nutrition and fluid intake.

74.     One of the GEO nurses stated that when Mr. Samimi got to the cell after he "supposedly fainted," Mr. Samimi started a "feigned seizure."

75.     The nurses did not contact Dr. Peterson and did not conduct a follow-up nursing assessment for six hours.

76.     The nursing assessment from 8:30 p.m. included "signs and symptoms of withdrawal" and Mr. Samimi's complaints of nausea and vomiting.

<u>November 25-27, 2017: GEO Nurses Fail to Notify Dr. Peterson of Mr. Samimi's Severe Withdrawal Symptoms</u>

77.     The following day, November 25, 2017, Mr. Samimi again declined all three meals.

78.     He complained of abdominal pain, weakness, nausea, and vomiting.

79.     That evening, a GEO nurse filled out a CIWA alcohol withdrawal form— incorrectly.  The score indicated severe alcohol withdrawal, based on Mr. Samimi's indications of nausea, vomiting, tremors, anxiety, and paroxysmal sweating.

80.     According to ICE's Detainee Death Review, "prudent nursing practice called for contacting Dr. Peterson," which the GEO nurse did not do.

81.     Instead of notifying the physician of Mr. Samimi's severe symptoms, the nurse told Mr. Samimi to pick up his trash, clean his room, and stay up as much as possible during the day.

82.     On November 26, 2017, Mr. Samimi again refused all three meals.

83. Around noon that day, Mr. Samimi complained to a GEO nurse that he had pain all over. Mr. Samimi's speech was slurred and he had trouble walking. The nurse's assessment was "possible withdrawal."

84. That evening, the same GEO nurse who previously completed a CIWA alcohol withdrawal form did another one, noting Mr. Samimi's anxiety, nausea, vomiting, tremors, and paroxysmal sweats. Although she added up the scores incorrectly, the total score still broke the threshold for severe alcohol withdrawal. Nonetheless, the nurse did not notify Dr. Peterson.

85. During the visit from the nurse, Mr. Samimi fell over due to weakness.

86. Afterward, Mr. Samimi became very upset to his stomach and told an officer that the smell of food was making him feel ill.

87. The GEO nurse told this officer that Mr. Samimi was faking to avoid being transferred to general population, and that Dr. Peterson was thinking of discharging Mr. Samimi from the medical unit. The officer thought Mr. Samimi was not faking and said he looked worse than when he was first admitted.

88. That night, at 1 a.m., Mr. Samimi yelled for a nurse because he was unable to relax. The nurse gave him an injection of Ativan.

89. Mr. Samimi again refused all three meals on November 27, 2017.

90. At about 7 p.m. that evening, a GEO nurse refused Mr. Samimi's request for ice. For the past few days when Mr. Samimi had been refusing meals, he had repeatedly asked for and been given ice, likely due to the dehydration and discomfort from repeatedly vomiting.

91. The 7 p.m. encounter was the first nursing assessment since 1 a.m. the previous night.

<u>November 28, 2017: Mr. Samimi Collapses and Later Attempts Suicide</u>

92.    On November 28, 2017, Mr. Samimi's withdrawal caused him to continue to deteriorate, both physically and mentally.

93.    That morning, Mr. Samimi collapsed on his way to a mental health appointment.

94.    Mr. Samimi said he hadn't eaten in eight days due to nausea, and he asked for stronger medications to combat his withdrawal symptoms.

95.    The GEO nursing assessment from that morning was "dehydration, nutritional needs not met." The nurse wrote, "no matter his actions, stronger meds unavailable." The nurse later explained that he was trying to make the point to Mr. Samimi that he was not helping himself by doing the things he was doing and that he needed to cooperate because he was not going to get methadone.

96.    The mental health professional came out in the hallway and observed that Mr. Samimi was lying down, pasty, confused, wobbly in appearance, disheveled, and "really ill."

97.    The mental health professional told this to Dr. Peterson, but Dr. Peterson did nothing at that point to provide Mr. Samimi with medication for his OUD or to increase dosages of withdrawal medication.

98.    The mental health professional agreed that Mr. Samimi was not stable enough to proceed to his mental health appointment.

99.    Later that night, Mr. Samimi took the sheet from his bed, tied it around his neck, and pulled with both arms. An officer discovered him that way, went to get help, and returned two minutes later with other staff. They forcefully removed the sheet from Mr. Samimi's neck.

100.    Nurses called Dr. Peterson, who placed Mr. Samimi on suicide watch at approximately 9 p.m.

November 29-30, 2017: GEO Nurses Continue to Respond Cruelly and Incompetently

101.     At 11 a.m. the following morning, November 29, 2017, Mr. Samimi received a psychiatric evaluation.  He complained of inability to sleep, constant vomiting, sweating, and shaking.  The psychiatrist noted that Mr. Samimi's CIWA scores were consistently increasing over time.

102.     The psychiatrist noted that CIWA was unsuitable as an opiate withdrawal instrument and instead ordered COWS monitoring for ten days.  She also discontinued Mr. Samimi's Ativan and instead prescribed Hydroxyzine for anxiety and Trazodone for sleep.  She ordered that Clonidine continue, that Immodium be taken after each loose stool, Ensure be offered with each meal, and that Mr. Samimi be placed on Level 2 suicide watch.

103.     The psychiatrist told a GEO nurse she was surprised no COWS assessments had been completed.  The nurse had to look up "COWS" and printed a form from the Internet.

104.     Despite the fact the psychiatrist ordered it, no GEO nurses ever performed a COWS assessment on Mr. Samimi.

105.     That night, Mr. Samimi repeatedly requested ice water.  A GEO nurse told him to "get it from the sink" in the cell.

106.     As midnight passed, a nurse observed that Mr. Samimi had a nosebleed.  He had blood on his nose, on his right sleeve, and in his mouth, which he spat on the floor.  The GEO nurse did not notify Dr. Peterson.

107.     Mr. Samimi was screaming for a nurse throughout the night.  At about 7 a.m. on November 30, 2017, a GEO nurse denied Mr. Samimi ice water again and said he "will drink water like everyone" else.

108.     That day, Mr. Samimi did not accept any meals.

109.    At about 11 a.m., Mr. Samimi had an appointment with a tele-psychiatrist.  Mr. Samimi complained of feeling "stressed and depressed," and said, "I want to die and not be here because of my methadone.  I was on high doses for 28 years."

110.    The tele-psychiatrist diagnosed Mr. Samimi with opioid withdrawal and opioid use disorder. The previous psychiatrist's plan was continued.

111.    That evening, ACDF's Health Services Administrator overheard Mr. Samimi's legal call and concluded, without basis, that Mr. Samimi's ability to answer questions supported the theory that he was faking the seriousness of his symptoms.

<u>December 1, 2017: A GEO Nurse Is Left with Regrets for Not Calling 911 After Mr. Samimi</u>
<u>Loses the Strength to Sit and Complains of Pain so Bad He "Just Want[s] to Die"</u>

112.    That night, Mr. Samimi's condition became increasingly critical, as he was losing the strength to even sit up.

113.    After 3 a.m. on December 1, 2017, Mr. Samimi sat up from the mattress on the floor on which he was lying. He grabbed a cup and twice tried to reach for the sink above the toilet with his cup, but collapsed both times, with his hand and the cup falling into the toilet.

114.    He tried to sit up but fell to the ground again. An officer came and helped Mr. Samimi to a sitting position, and Mr. Samimi fell over onto his right side. His head narrowly missed the concrete wall as he fell.

115.    The officer brought him a cup of water. Mr. Samimi was able to take a sip but then collapsed yet a fourth time. A GEO nurse came to give him another cup of water, and Mr. Samimi sat up, only to fall backwards.

116.    A few minutes later, the nurse returned and took Mr. Samimi's blood pressure. When she lifted his arm, he screamed, and the nurse told him to stop being so difficult. Mr. Samimi screamed, "It hurts so fucking bad. I just want to die."

-17-

117.    The nurse wrote in a medical progress note that Mr. Samimi had been talking to himself that night.

118.    In a later interview with investigators, the nurse said she was very concerned by this point because Mr. Samimi was very weak and had yet to see Dr. Peterson.

119.    The nurse said that leading up to that point, Mr. Samimi's pleas for medication led her to conclude that he was drug-seeking.

120.    The nurse expressed regret for not calling emergency services but feared being criticized. She said, "Do I wish I had sent him out? Yes. I haven't slept since."

121.    At approximately 9:30 that morning, a GEO nurse came with a wheelchair to take Mr. Samimi to a tele-psychiatry appointment.  Mr. Samimi asked for help to get into the wheelchair, but the nurse told him no, that Mr. Samimi could do so by his own power.

122.    On the way to the appointment, Mr. Samimi fell out of the wheelchair. He landed on the floor face-first. Mr. Samimi sustained a nosebleed and urinated on himself.

123.    The nurse believed that Mr. Samimi threw himself out of the wheelchair intentionally.

124.    Dr. Peterson arrived on the scene. *He did not assess or speak with Mr. Samimi*. Dr. Peterson was confident, based on the nurse's description of what happened, that Mr. Samimi intentionally threw himself on the floor, which could be a suicidal gesture, so Dr. Peterson returned Mr. Samimi to level one suicide watch.

125.    Mr. Samimi refused his meals that day and spat out the Ensure that was offered in the afternoon.

126. At 10:29 p.m., an officer saw Mr. Samimi spitting up blood, and medical staff were informed. At 11:34 p.m., Mr. Samimi complained of stomach pain, and an officer documented that "nurses [were] not available." A GEO nurse finally arrived at 11:44 p.m.

127. The officer who was the Constant Watch Officer for Mr. Samimi that night started his shift at 11:00 p.m. When the officer's shift ended in the morning, he wrote an account because he had never seen a detainee as sick as Mr. Samimi, and because of what happened. The officer later turned his notes into an incident report.

128. In his report, the officer wrote, "From the moment I assumed the post, there was a strange odor emanating from his room which I assumed was vomit."

129. At 11:44 p.m., a GEO nurse came to take Mr. Samimi's vital signs and give him medication. The nurse said, "It smells like he has liver failure."

130. Mr. Samimi was only able to swallow one pill, and the remaining ones were left in a cup on the mattress.

<u>December 2, 2017: Mr. Samimi Dies, After GEO Nurses Refuse to Call Emergency Services</u>

131. Mr. Samimi's critical condition continued to deteriorate throughout the night.

132. Several times during the night, Mr. Samimi screamed that he was unable to breathe. A re-breather was provided. At 3:30 a.m. on December 2, 2017, he woke up screaming for something to help with his nausea. He was unable to swallow Phenergan, so he was given an injection of Zofran. A GEO nurse's progress record notes that Mr. Samimi "[d]id not take any of his night medications."

133. Mr. Samimi got up every few minutes complaining of stomach pains throughout the night. On six different occasions, the officer who wrote the incident report told medical staff

that Mr. Samimi was in pain and was requesting more medication. A GEO nurse came and told the officer that Mr. Samimi could not take more medication unless he ate some food.

134.     Mr. Samimi vomited at 6:16 a.m. and again at 6:44 a.m. GEO nurses were notified both times.

135.     A Registered Nurse (RN) and a Licensed Practice Nurse (LPN) came in, along with the officer who wrote the report and a medical officer. They noticed that Mr. Samimi had been incontinent of urine, as the floor was wet. They removed the wet mattress. When the medical officer asked the nurses what was wrong with Mr. Samimi, the LPN responded, "He's dying," and walked away.

136.     The officer who wrote the report asked why 911 was not being called, but neither nurse responded.

137.     At some point during the shift, the officer called over his lieutenant and said he was very concerned. The lieutenant asked the nurses what was going on, because his officer said Mr. Samimi was suffering. The nurses told him that Dr. Peterson was aware of the situation and planned to see Mr. Samimi. The lieutenant later said he had lost battles with Dr. Peterson in the past, and that in retrospect, he wished he had called 911 then, but did not because he was told Dr. Peterson was fully informed.

138.     When the officer's shift ended at 7 a.m., he let the relieving officer know about everything that had happened and told the relieving officer to keep a good eye on Mr. Samimi.

139.     At 10:15 a.m., Mr. Samimi was served breakfast. He initially refused to eat, but the officer now watching him told him he needed to eat so he could take medicine. Mr. Samimi began to eat his breakfast and drank a little water.

140.   Mr. Samimi ate something at 10:15 a.m. Between 10:35 and 10:50, he vomited and screamed for a nurse. At one point, Mr. Samimi called for God and asked why the nurses were not helping him. The officer notified a nurse and eventually the lieutenant.

141.   The officer felt Mr. Samimi had further declined over the past four hours and was in an extremely weakened condition. The officer kept looking at Mr. Samimi to make sure he was breathing. The officer reported his concern to GEO nursing staff, who said they thought Mr. Samimi was faking.

142.   The officer was asked to take Mr. Samimi to his 11 a.m. mental health appointment, but the officer refused because he believed Mr. Samimi was too unstable to move.

143.   Mr. Samimi was put in a wheelchair. Then, his head rolled back, and his body stiffened and began to shake. Mr. Samimi slid out of the chair, but staff caught him and carried him back to the mattress.

144.   The nurses left the cell, but then Mr. Samimi began to make a choking sound. Officers called the RN back and turned Mr. Samimi on his side. Mr. Samimi vomited, and this time there were blood clots in his vomit.

145.   The mental health appointment was canceled. The psychologist noted that staff tried to put Mr. Samimi into a wheelchair "because this patient has had a significant history of being unstable on his feet," and that the appointment could not proceed "because he was now laying on the floor vomiting up blood."

146.   One of the officers told the RN to call Dr. Peterson. The RN left to do so. The RN did not call 911 because, in the RN's words, the situation was not a "super emergency." He intended to tell Dr. Peterson that Mr. Samimi needed alternative placement because his needs

exceeded ACDF's capabilities. The LPN said it was "not going good. He wasn't actively dying or it would have been 911."

147.   Then, at 11:07 a.m., the lieutenant arrived at Mr. Samimi's cell and saw him lying on the floor, "clearly in crisis." Mr. Samimi had vomit on the side of his face, had urinated, and was breathing heavily.

148.   The lieutenant went to the nurses' station and said to the RN, "What are you doing? We need an ambulance." The RN said he had left messages for Dr. Peterson and was trying to call the Health Service Administrator. The lieutenant called Central Control to initiate a 911 call. The call was made at 11:10 a.m.

149.   The RN said he left messages for Dr. Peterson, but Dr. Peterson said he did not receive them. Dr. Peterson was hanging Christmas lights that morning. The RN thanked the lieutenant for calling an ambulance.

150.   The control officer later reported, "Aurora did great. [GEO] medical not so much. They never went back to check on him. Never checked his pulse, BP."

151.   After initiating the 911 call, the lieutenant returned to the cell, where he saw Mr. Samimi breathing with vomit on and around his face, and possibly blood on the floor.

152.   The paramedics arrived at Mr. Samimi's cell at 11:18 a.m. Mr. Samimi stopped breathing, had no pulse, and was unresponsive. The paramedics performed CPR, and a Basic Life Support airway was put in place. Mr. Samimi had "coffee ground type emesis." He was shocked one time.

153.   At 11:33 a.m., Mr. Samimi was lifted onto a gurney and wheeled out. Paramedics continued working on Mr. Samimi in the ambulance.

154.    The ambulance arrived at the University of Colorado Medical Center in Aurora in 11:45 a.m. The emergency room records note that the black vomitus on Mr. Samimi's face and in his airway suggested a possible gastro-intestinal bleed.

155.    Mr. Samimi was pronounced dead at 12:02 p.m. on December 2, 2017.

156.    According to the ACDF Medication Administration Record, Mr. Samimi received a dose of ibuprofen at 2:00 p.m. and clonidine at 3:00 p.m. on December 2, 2017, even though Mr. Samimi was already taken out of ACDF and pronounced dead at that point.

157.    In its report dated January 30, 2018, the Office of the Coroner for Adams and Broomfield Counties concluded that Mr. Samimi died of undetermined causes, but that "[c]hronic obstructive pulmonary disease (emphysema) and gastrointestinal bleeding likely contributed to death. Methadone withdrawal cannot be ruled out as the cause of death. . ."

### GEO's Attempts to Whitewash Mr. Samimi's Death

158.    GEO's own internal reviews of Mr. Samimi's death can be described as a whitewashing, at best.

159.    On December 6, 2017, GEO employees at ACDF held their monthly safety committee meeting. According to the meeting minutes, the committee reviewed the circumstances leading to Mr. Samimi's death.

160.    The minutes contain the following summary:

Security and medical staff acted in a responsible and professional manner. All requests for E.M.S. assistance and protocol notifications all made in a timely fashion. The incident began at 11:08 hrs. With a detainee becoming semi-responsive. EMS services were requested and arrived at 11:16 hrs' [sic], and began a medical assessment and treatment. The detainee's condition deteriorated and E.M.S. began life saving procedures. The detainee was transported to University Hospital Emergency Department and was pronounced dead at 12:02 hrs.

161.    The minutes then reflect the following findings of the safety committee: "Medical and security staff acted properly as directed by policy and procedures. Several Department Heads at the facility were unaware of the incident until later in the week."

162.    Then, on December 18, 2017, GEO issued a Multi-Level Mortality Review. The report inaccurately stated that (1) Mr. Samimi used methamphetamines; (2) "[a]ppeared to progress well with withdrawal protocol;" (3) did not cooperate in mental health evaluations; and (4) completed withdrawal.

163.    The GEO Mortality Review identified one strength with respect its staff's conduct: "Quick initiation of withdrawal protocol. Monitoring of detainee while on withdrawal protocol." It included a lone recommendation: "Re-emphasize to all nursing staff, use your clinical judgment to call 911 when presented with a life or death situation."

<u>Investigator Interviews Reveal the Extent of Medical Neglect and Cruelty at ACDF</u>

164.    The interviews conducted by investigators following Mr. Samimi's death showed that officers were genuinely concerned about Mr. Samimi, and that their battles with the GEO medical staff, whom officers perceived as uncaring and unresponsive, had carried on for some time.

165.    The Detainee Death Review: "All officers were troubled by what they perceived was a lack of concern and care for Samimi." One officer stated that medical staff were not compassionate and could have done more.

166.    One officer in particular was emotional during her interview because she had watched Mr. Samimi suffer. She said that "[s]he slowly and painfully watched the man die," and she "[w]ished she could have done more." She said, "[w]e didn't have people who cared enough to save him."

167.     An officer stated GEO nurses would take a long time to respond to Mr. Samimi; getting them to do so was "like pulling teeth."

168.     The officers did not share the nurses' widespread view that Mr. Samimi was faking his symptoms.

169.     The officers and their lieutenant shared their longstanding frustrations with GEO medical staff. The lieutenant said officers would call him every night to say medical staff were not responding to detainees who clearly needed attention. He attributed it to arrogance on the part of medical staff. The lieutenant shared the example of a detainee whose appendix burst because medical staff did not attend to him quickly enough.

170.     An officer said of medical staff, "People don't do their jobs – they aren't working with me, they are working against me." The officer would tell medical staff about detainees' medical concerns, and the staff would respond, "Tell him to write a kite." The nurses would even take their time in emergencies.

171.     The GEO nurses said they were short-staffed, very busy, and stressed out. One LPN said, "Nurse sick call is killing them, particularly because population i[s] up. Everyone has a kite." They were short three nurses at the time of Mr. Samimi's death. The Health Services Administrator said, "Resources are stretched as thin as they can get." The chief of security said, "When staffing gets as thin as it was, it can impact. . . . Unfortunate outcome. It does happen."

172.     A nurse reported that it was difficult to reach Dr. Peterson when he was on call. He would not be reached two out of five times, his voicemail was not set up, he only returned missed calls half of the time, and he was never successfully reached at home.

173.     For his part Dr. Peterson said with regard to the circumstances leading to Mr. Samimi's death, "Maybe in the last 48 hours I should have been called." He said, "RNs can call

911. Nurses not from the U.S. apparently aren't used to such freedoms." He also said, "A lieutenant here is married to an immigrant, so he would have called if he thought something was wrong."

## FIRST CLAIM FOR RELIEF
### (Violations of the Rehabilitation Act – 29 U.S.C. § 794)
*Against Defendant GEO*

174.    Plaintiffs incorporate all allegations of this Complaint as though set forth herein.

175.    Section 504 of the Rehabilitation Act prohibits discrimination on the basis of disability in (1) any program or activity receiving federal financial assistance; or (2) under any program or activity conducted by any Executive agency or the United States Postal Service. 29 U.S.C. § 794.

176.    GEO operated a program or activity for ICE, and it receives federal financial assistance. For example, GEO's federal financial assistance includes subsidies the corporation receives in connection with its Voluntary Work Program for federal detainees housed at GEO facilities, through which:

(a)    The United States authorizes GEO to use detainees to perform essential work at wages far, far below market rates, work that GEO would otherwise be required to carry out with additional staff hired from the community at market rates, thus providing GEO a significant financial benefit;

(b)    The United States provides GEO a stipend of $1 per day for each detainee who participates in the Voluntary Work Program.

177.    Additionally, GEO operates a program or activity conducted by an Executive agency. Specifically, ICE is a component agency of the U.S. Department of Homeland Security (DHS), which is an Executive agency. *See* 6 C.F.R. § 15.1. In its Component Self-Evaluation and Planning Reference Guide, DHS acknowledges that its "federally conducted programs" include

"operation of immigration detention facilities."[1] The DHS document further states that "[a] Component's activities carried out through contracts are considered conducted activities and are subject to the same obligations [of complying with the Rehabilitation Act]." *Id.*; *see also* Instruction on Nondiscrimination For Individuals With Disabilities In DHS-Conducted Programs And Activities (Non-Employment), DHS Directives System Instruction No. 065-01-001 (defining conducted activities of DHS to include "those carried out through contractual or licensing arrangements").

178.    Mr. Samimi was an individual with a disability. He had opioid use disorder (OUD), a chronic, relapsing brain disease that is associated with addiction to opioids.

179.    Decades ago, Mr. Samimi was addicted to opium. Mr. Samimi began taking methadone in 1991 to treat his OUD. In May of 2011, Mr. Samimi was admitted for treatment at the ARTS clinic. Since that time, up until the day he was taken into ICE custody, he was receiving Outpatient Treatment, which included weekly Relapse Prevention group sessions and a daily dose of 190 mg of methadone, under the supervision of the ARTS clinic.

180.    GEO discriminated against Mr. Samimi solely because of his disability. Mr. Samimi suffered intentional discrimination at GEO solely because he was addicted to opioids.

181.    GEO's policies and practices manifested deliberate intentional discrimination and/or deliberate indifference to the likelihood that detainees with opioid use disorder would suffer illegal discrimination in GEO's facility. GEO failed to ensure that its medical staff had appropriate training for responding to detainees with OUD.

---

[1]    *See*    https://www.dhs.gov/sites/default/files/publications/disability-guide-component-self-evaluation.pdf, Section 4.3.1.

182.     On repeated occasions, GEO's medical staff, including Dr. Peterson, revealed their discriminatory animus toward Mr. Samimi, because of his opioid addiction. On repeated occasions, GEO's medical staff and Dr. Peterson callously and erroneously dismissed Mr. Samimi's suffering and his repeated complaints as "faking" or "manipulation." Nurses called Mr. Samimi "an addict" and said, "If you're going to live like that it's expected you're doing to die like that."

183.     Because of his disability, Mr. Samimi was denied access to services at GEO for which he was otherwise qualified.

184.     For example, when incoming detainees have a serious medical need, it is GEO's policy and practice to provide or arrange for medical treatment. Mr. Samimi's OUD was a serious medical condition that merited medical treatment.  It was GEO's practice, however, to refuse to provide or arrange treatment for detainees with OUD. Forcing Mr. Samimi to undergo the pain and suffering of withdrawal is not treatment for OUD.

185.     When incoming detainees have current prescriptions for medications, it is GEO's policy and practice to continue those medications or provide medically appropriate substitutes. GEO refused to allow Mr. Samimi to continue taking his legally-prescribed methadone, and GEO refused to provide a medically appropriate substitute.

186.     Instead of treating Mr. Samimi's OUD, GEO's medical director, following GEO policy, forced Mr. Samimi to undergo withdrawal. Because Mr. Samimi had been taking a high dose of methadone and had been on methadone maintenance for many, many years, that withdrawal was foreseeably long-lasting and foreseeably intense. Although Mr. Samimi was prescribed medications intended to ameliorate somewhat the symptoms of withdrawal, GEO's medical staff on multiple occasions failed to provide the prescribed medications. For example,

although Mr. Samimi was repeatedly nauseous, repeatedly vomiting, and was unable to eat, medical staff provided only 4 of the 42 doses of anti-nausea medication that had been prescribed.

187.    By making it virtually impossible for Mr. Samimi to eat, GEO impeded and denied Mr. Samimi access to basic nutrition, because of his disability, a service for with he was otherwise qualified and which GEO extended to other detainees without discrimination.

188.    As Mr. Samimi's condition deteriorated, he was denied participation in other programs and services at GEO for which he was otherwise qualified. For example, Mr. Samimi was denied access to an appointment with a mental health provider when he collapsed on his way to the appointment.  Mr. Samimi's requests for medication that would reduce his cravings, such as methadone or an appropriate substitute, or stronger medications to alleviate the suffering of his withdrawal, must regarded as requests for reasonable accommodations. Mr. Samimi's numerous requests were denied. In addition to denying Mr. Samimi's requests for additional medication, nurses failed to provide medications that the physician had already prescribed.

189.    Mr. Samimi's medical deprivation eventually made him so weak that he could not even obtain the service of clean drinking water at GEO. When Mr. Samimi asked for ice water, a nurse brazenly blatantly refused, saying that he should "get it from the sink."

190.    GEO's violations of the Rehabilitation Act caused Mr. Samimi to endure pain, suffering, and severe emotional distress, and eventually caused Mr. Samimi's death.

191.     As a result of GEO's violations of the Rehabilitation Act, Plaintiffs have suffered compensatory damages.

### SECOND CLAIM FOR RELIEF
**(Negligent Hiring, Supervision, and Training)**
*Against Defendant GEO*

192.    The previous allegations are incorporated by reference.

193.    GEO has a duty to exercise reasonable care in hiring medical professionals at the ACDF facility it operates.

194.    Indeed, GEO has an increased responsibility to exercise reasonable care in hiring medical professionals because the individuals in the custody of GEO are forced to rely on the GEO medical staff to care for all of their basic medical needs. GEO was negligent in failing to hire sufficient medical personnel to be able to provide for the basic care of patients detained at ACDF.

195.    Accordingly, GEO breached its duty to exercise reasonable care in hiring the medical professionals at the facility and that breach was the proximate cause of Mr. Samimi's suffering and, ultimately, his death.

196.    A defendant has a duty to supervise when the principal or employer has reason to know that the agent or employee is likely to harm others because of its qualities and the work or instrumentalities entrusted to it. *Settle v. Basinger*, 411 P.3d 717, 723 (Colo. App. 2013).

197.    GEO negligently supervised its nurses, and it knew or should have known that the nurses had qualities that would lead them to injure the patients they were entrusted to care for. There are several facts that point to GEO having this knowledge.

198.    First, several officers expressed that they thought the nurses were non-responsive and negligent. ("Nurses typically have a cavalier attitude, generally neglectful;" "Officers call every night to say medical not responding to detainees who clearly need attention. 'Arrogance' on the part of medical.'"). GEO should have known about the reputation of its nursing staff within ACDF, and this knowledge would put them on notice that there was an undue risk to patients in ACDF.

199.    Second, many of the GEO nurses acknowledged having no training or experience in treating patients with withdrawal symptoms, but one nurse noted that they deal with a lot of

opioid withdrawal cases. GEO should have known that its nurses were untrained in withdrawal symptoms—at least in part because GEO did not provide any training—and this created a substantial risk of serious injury or death for detainees suffering from withdrawal.

200.     Because GEO either knew or should have known of the nurses' patterns of neglect or lack of training, GEO was negligent in supervising its medical staff, which ultimately led to Mr. Samimi's death.

201.     GEO owed a duty to Mr. Samimi to train its medical professionals in proper care for opioid use disorder and persons undergoing withdrawal.

202.     Because withdrawal from opioids can be deadly, or at least incredibly painful and lead to relapses in addiction, the likelihood of injury when medical professionals are not properly trained is high.

203.     Additionally, the social utility of training medical professionals on how to properly treat and monitor those with withdrawal symptoms is high. The magnitude of the burden is not great, given the small number of nurses GEO employs at ACDF. Therefore, these factors point towards recognizing a duty for GEO to train its medical professionals in how to properly treat patients with OUD or who may be going through opioid withdrawal.

204.     GEO breached this duty. Several GEO nurses said they had minimal or no training in how to treat withdrawal symptoms. Several nurses erroneously dismissed Mr. Samimi's symptoms and actions as manipulative "drug-seeking" and did not pay as close attention to his symptoms although his behavior was normal and expected for a person with OUD who was going through withdrawal.

205.     Additionally, many GEO nurses did not know what COWS was or how to use it, including one nurse who had to do an internet search on what it was, but never completed the form.

206.     Furthermore, in an interview, Dr. Peterson said the nurses have "No real training—it's real world training and they are RNs."

207.     Additionally, the nurses appeared to not be trained to contact 911 in the hours before Mr. Samimi's death, despite realizing that "[h]e's dying."

208.     The failure to train the nurses to recognize and properly treat Mr. Samimi's withdrawal proximately caused his death, as his withdrawal symptoms worsened until his condition deteriorated to the point of his death.

209.     Therefore, GEO was negligent in training its nurses on opioid withdrawal procedures, which caused Mr. Samimi's rapid decline and death.

210.     As a result of GEO's negligence, Plaintiffs suffered damages in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
**(Negligence)**
*Against Defendant GEO*

211.     GEO and its medical staff had a duty to provide reasonable medical care to Mr. Samimi and all other detainees in the ACDF facility.

212.     GEO nurses ignored basic nursing protocols by failing to evaluate Mr. Samimi with COWS and by using alcohol withdrawal forms instead.  Additionally, nurses failed to notify Dr. Peterson when the incorrect withdrawal forms they used indicated that they should.

213.     GEO nurses ignored basic nursing protocols by failing to administer dosages of medications and failing to take Mr. Samimi's vital signs as often as instructed.

214.     The nurses also breached the applicable standard of care because they did not transfer Mr. Samimi to the emergency room or otherwise ensure he received life-saving medical services despite his clear, obvious, and easily understood life-threatening withdrawal symptoms.

215.    These acts and omissions directly resulted in Mr. Samimi's death.

216.    The nurses should have known that Mr. Samimi's symptoms were serious signs of opioid withdrawal. At minimum, the GEO nurses should have known that these symptoms demanded immediate emergency medical attention.

217.    Moreover, Mr. Samimi's symptoms should have alerted the nurses to the fact that inattention and/or inaction would place Mr. Samimi in an unreasonable risk of physical harm.

218.    Indeed, Mr. Samimi's symptoms would lead any reasonable nurse to conclude that Mr. Samimi was in a dire condition and in need of immediate emergency medical treatment.

219.    The nurses who were tasked with Mr. Samimi's medical care either knew or should have known that not seeking immediate emergency medical attention for Mr. Samimi, including calling 911 and ensuring Mr. Samimi was seen by a doctor as soon as possible, created an unreasonable risk of death.

220.    The nurses' actions and omissions, including their failure to call 911 when Mr. Samimi began showing life-threatening symptoms, was a proximate cause of his death, as he was unresponsive and pulseless when the EMTs arrived.

221.    At all relevant times hereto, the nurses were employees of GEO and their actions and omissions at issue occurred during and within the course and scope of their employment with GEO.  Therefore, GEO is liable for the nurses under the doctrine of *respondeat superior*.

222.    As a result of GEO's negligence, Plaintiffs suffered damages in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF
### (Reckless Disregard of Safety)
*Against Defendant GEO*

223.    The previous allegations are incorporated by reference.

224.     GEO had a duty to provide medical care to Mr. Samimi and all other detainees in the ACDF facility.

225.     GEO's understaffing, which left the facility with one doctor for about 1,000 detainees and an insufficient number of nurses, was a failure to act in violation of GEO's duty to provide medical care to its detainees.  GEO should have known that this understaffing was reckless and created an unreasonable risk of physical harm to Mr. Samimi and other detainees.

226.     GEO nurses also breached their duty of care because they did not transfer Mr. Samimi to the emergency room or otherwise ensure he received life-saving medical services despite his clear, obvious, and easily understood life-threatening withdrawal symptoms.

227.     These acts and omissions directly resulted in Mr. Samimi's death.

228.     Additionally, GEO breached its duty to provide medical care to Mr. Samimi in other ways which rise beyond the level of negligence.

229.     In the days before his death, the nurses knew that Mr. Samimi was dehydrated, fainting, vomiting, nauseous, and experiencing a great deal of pain.

230.     In addition, in the early morning hours of his death, Mr. Samimi was continuously screaming in pain, was vomiting, had blood clots in some of his vomit, had seizure-like symptoms when nurses attempted to place him in a wheelchair, vomited on himself, and urinated on himself.

231.     In fact, several officers and the lieutenant who witnessed these events noted that they "had never seen a detainee as sick as Samimi," one of the nurses remarked "he's dying" when asked what was wrong with him, another nurse noted that he called the doctor "to notify him that alternate placement should be sought for Samimi because his needs exceed ACDF's capability to handle," and several officers urged the nurses to call 911.

232.     The nurses should have known that Mr. Samimi's symptoms were serious signs of opioid withdrawal. At minimum, the nurses should have known that these symptoms demanded immediate emergency medical attention.

233.     Moreover, Mr. Samimi's symptoms should have alerted the nurses to the fact that inattention and/or inaction would place Mr. Samimi in an unreasonable risk of physical harm.

234.      Indeed, Mr. Samimi's symptoms would lead any reasonable nurse to conclude that Mr. Samimi was in a dire condition and in need of immediate emergency medical treatment.

235.     The nurses who were tasked with Mr. Samimi's medical care either knew or should have known that not seeking immediate emergency medical attention for Mr. Samimi, including calling 911 and ensuring Mr. Samimi was seen by a doctor as soon as possible, created an unreasonable risk of death that constitutes reckless disregard of safety.

236.     The nurses' actions and omissions, including their failure to call 911 when Mr. Samimi began showing life-threatening symptoms, was a proximate cause of his death, as he was unresponsive and pulseless when the EMTs arrived.

237.     At all relevant times hereto, the nurses were employees of GEO and their actions and omissions at issue occurred during and within the course and scope of their employment with GEO.  Therefore, GEO is liable for the nurses under the doctrine of *respondeat superior*.

238.     Accordingly, GEO is liable for the reckless disregard of Mr. Samimi's safety which led to his dire medical situation and ultimately his death.

239.     As a result of GEO's reckless conduct, Plaintiffs suffered damages in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF
**(Medical Malpractice)**
*Against Defendant Dr. Peterson*

240.     Dr. Peterson had a duty to provide medical care to Mr. Samimi because they had a physician-patient relationship.

241.     Dr. Peterson had a duty to Mr. Samimi because he undertook to provide medical care and thus act with ordinary care and diligence.

242.     Dr. Peterson breached his duty of reasonable care by not providing Mr. Samimi with adequate and proper medications. To the extent Dr. Peterson had authority to make a treatment decision, Dr. Peterson breached his duty of reasonable care by failing to treat Mr. Samimi's OUD and by ordering that Mr. Samimi be cut off cold turkey from the methadone he had been taking legally for decades. Dr. Peterson breached the duty of care by ordering that Mr. Samimi be forced to undergo withdrawal.  Furthermore, in ordering that Mr. Samimi be forced to endure withdrawal, Dr. Peterson breached the duty of care by ordering that Mr. Samimi be cut off cold turkey instead of tapering Mr. Samimi's dosage.

243.     Dr. Peterson also failed to protect Mr. Samimi's health and safety by failing to physically examine Mr. Samimi, by not evaluating whether Mr. Samimi should be transferred to a hospital, by not ensuring that prescribed medications for withdrawal were provided, and by not taking all necessary steps to ensure that the withdrawal proceeded safely.

244.     Dr. Peterson ignored clear indications of Mr. Samimi's severe withdrawal symptoms, and did nothing in response.

245.     Dr. Peterson also breached his duty by failing to supervise the nurses in providing Mr. Samimi with medical care.

246.    Dr. Peterson further breached his duty of reasonable care by not responding to emergency calls when he was supposed to be reachable by the medical staff at GEO.

247.    As illustrated above, Dr. Peterson committed medical malpractice in his care of Mr. Samimi, and this malpractice led to Mr. Samimi's increased suffering and eventual death.

248.    As a result of Dr. Peterson's professional negligence, Plaintiffs suffered damages in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF
### (Wrongful Death)
*Against All Defendants*

249.    The previous allegations are incorporated by reference.

250.    As illustrated in the preceding paragraphs, Mr. Samimi's death was caused by the negligence of GEO, GEO's employees, and Dr. Peterson.

251.    As a result of defendants' negligence, plaintiffs, as lineal heirs of Mr. Samimi, suffered damages in amounts to be proven at trial.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for relief as follows:

a.    An award of compensatory damages;

b.    An award of reasonable attorneys' fees and costs;

c.    Interest from the date of each violation; and

d.    Any further or other relief the Court deems just and proper.

## JURY DEMAND

Plaintiffs request a trial by jury in this matter.

Dated this 12th day of November, 2019  BAKER & HOSTETLER LLP


/s/ Paul G. Karlsgodt
Paul G. Karlsgodt
Marc D. Flink
Matthew C. Baisley
Michelle R. Gomez
Sean B. Solis
1801 California Street, Suite 4400
Denver, Colorado  80202
Tel: 303.861.0600
Fax: 303.861.7805
Email: pkarlsgodt@bakerlaw.com
mflink@bakerlaw.com
mbaisley@bakerlaw.com
mgomez@bakerlaw.com
ssolis@bakerlaw.com

*In cooperation with the ACLU Foundation of Colorado*

Mark Silverstein
Sara R. Neel
Arielle Herzberg
ACLU Foundation of Colorado
303 East 17th Avenue, Suite 350
Denver, Colorado  80203
Tel: 720-402-3107
Fax: 303.777.1773
Email: msilverstein@aclu-co.org
sneel@aclu-co.org
aherzberg@aclu-co.org

*Attorneys for Plaintiffs*